Juyoun Han (*pro hac vice*)
Eric Baum (*pro hac vice*)
**EISENBERG & BAUM, LLP**
24 Union Square East, PH
New York, NY 10003
Tel: (212) 353-8700
Fax: (212) 353-1708

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE ESTATE OF CARSON BRIDE, by and through his appointed administrator, KRISTIN BRIDE, KRISTIN BRIDE, A.K., A.C., A.O., on behalf of themselves and all others similarly situated, <br><br> *Plaintiff,* <br><br> v. <br><br> YOLO TECHNOLOGIES, INC., GREGOIRE HENRION, and DOES #1-10. <br><br> *Defendants.* | **Civil Action No.:** <br> **2:21-cv-06680-FWS-MRW** <br><br> **THIRD AMENDED COMPLAINT [CLASS ACTION]** <br><br> **DEMAND FOR JURY TRIAL** |

## <u>INTRODUCTION</u>

1.       In this class action lawsuit, the plaintiffs—several teenagers, the Estate of Carson Bride, a teenager who tragically took his own life due to anonymous online bullying, his mother Kristin Bride, —seek to hold

1

accountable Yolo Technologies, Inc. (Yolo) for operating online messaging applications and making false and deceptive statements that misled minors, as well as their parents, about the concrete steps that the companies would take to make their apps to be a safer design. For example, Yolo falsely stated that it would reveal the names of users who engage in harassment or bullying and ban them, and that there would be zero tolerance for objectionable conduct like harassment or bullying.

2.     In 2019, when Yolo launched their anonymous messaging app, YOLO had long understood that anonymous online communications pose a significant danger to minors, including by increasing the risk of bullying and other antinormative behavior and amplifying the negative feelings of victims. Prior anonymous apps were "vulnerable to being used to spread hate speech and bullying."[1] And on a number of occasions during the prior decade teenagers had taken their own lives after being cyberbullied on anonymous apps, such as Formspring.me, ask.fm, and Yik Yak. By 2019, the verdict was already in: anonymous messaging cause cyberbullying and harassment to metastasize, especially for minors.

---

[1] Josh Constantine, *#1 app YOLO Q&A is the Snapchat platform's 1st hit*, TechCrunch.com (May 8, 2019), https://techcrunch.com/2019/05/08/download-yolo-app/.

*The Estate of Carson Bride, et al. v. Yolo Technologies Inc., et al.*
THIRD AMENDED COMPLAINT

3.     Despite knowing this, Yolo forged ahead in making its anonymous messaging app widely available primarily to young children as an extension to Snapchat, a platform with hundreds of millions of users. Within a week of YOLO's launch, it became the top downloaded app in America and a "teen hit,"[2] and within months the app had 10 million active users.[3]

4.     But Yolo did not put a plan in place to meaningfully prevent the foreseeable and expected harm that would result from having millions of teenagers use anonymous messaging every single day. And despite the inherent dangers of anonymous messaging for teenagers and the technological obstacles that anonymity necessarily creates for preventing or mitigating the harm of cyberbullying, in 2019 Yolo launched anonymous messaging apps that they knew or should have known were not reasonably safe for minors.

5.     Compounding the problem, Yolo misled their minor users (and their parents) into believing that Yolo would take meaningful actions to make the YOLO app a safe space for users. For example, when teenagers downloaded the YOLO app onto their phones, Yolo specifically declared in conspicuous

_____

[2] *Id.*

[3] Josh Constantine, *Teen hit Yolo raises $8 million to let you Snapchat anonymously: Can it stop the trolls?*, TechCruch.com (February 28, 2020), https://techcrunch.com/2020/02/28/anonymous-snapchat-group-chat-yolo/.

3

*The Estate of Carson Bride, et al. v. Yolo Technologies Inc., et al.*
THIRD AMENDED COMPLAINT

pop-up messages that users would be "banned for any inappropriate usage"
and if they "send harassing messages to our users, [their] identity will be
revealed."

6.      But these statements were false when they were first made, and they
continued to be false as Yolo did not reveal the identities of users who
harassed or engaged in other inappropriate conduct or to ban those users. In
fact, when YOLO users reported other users who were sending bullying or
harassing messages, Yolo regularly did not respond to their inquiries or take
any action in response to them.

7.      As the popularity of YOLO grew, so did the bullying and harassment
of innocent teenagers who had been told that YOLO would be a safe space
with no tolerance for such abusive behavior. Minors routinely received
messages encouraging them to kill themselves, propositioning them for sex,
calling girls "whores," and incessantly mocking their physical appearances.

8.      On June 23, 2020, tragedy struck the Bride family: Carson Bride took
his own life at the age of 16 after suffering months of cyberbullying on
YOLO, which included physical threats, obscene sexual messages and
propositions, and other humiliating comments—and after unsuccessful,
tormenting efforts to find out who was sending him these abusive messages.

*The Estate of Carson Bride, et al. v. Yolo Technologies Inc., et al.*
THIRD AMENDED COMPLAINT

9.     But this tragic outcome was not unexpected, in light of the many teen

deaths that prior anonymous apps had caused and given the customer

reviews of YOLO that detailed the emotional harm minors were suffering on

those apps. In fact, it was only a matter of time before YOLO's anonymous

messaging apps caused the death of a teenager. And if it had not been

Carson, it would have been someone else's child. It could have been any of

our children.

10.     On May 10, 2021, Carson's mother, Kristin Bride, filed this lawsuit to

seek justice for her son and other minors whom Yolo harmed and misled,

and to prevent other families from suffering the same unthinkable loss.

Within 48 hours of filing the lawsuit, Snap suspended YOLO. And on

March 17, 2022, Snap announced that it would ban anonymous messaging

apps like YOLO from its platform. As Snap explained, "we believe some

users" of "anonymous integrations" like YOLO "might be more prone to

engage in harmful behavior — such as bullying or harassment — if they

have the shroud of anonymity."

11.     While the harms suffered by Carson and his family are irreversible,

the ban on YOLO and other anonymous messaging apps will save lives and

protect millions of teenagers from the grave dangers posed by anonymous

messaging apps. Yet it is still critical to ensure that YOLO do not resurface

5

on another platform besides Snap and lure millions of vulnerable teens into the danger of anonymous messaging.

12.    And it is vitally important to hold Yolo accountable for the harm that they have already caused to countless minors when they placed inherently dangerous products into the marketplace and misled users about the actions that they would take to promote safety on their apps. Three of those minors have joined this lawsuit through this amended complaint, having experienced similar abuse and bullying as Carson did before YOLO was thankfully shuttered.

13.    In this complaint, the plaintiffs assert common law claims for fraudulent and negligent misrepresentations against Yolo and statutory consumer protection claims against both defendants to address the false, misleading, and deceptive statements that Yolo made about its product.

14.    The plaintiffs bring this class action on behalf of all people who used YOLO from May 2019 to May 2021 when they were 13 to 17 years old, and those who will use YOLO in the future (should YOLO renew its operations).

**<u>PARTIES</u>**

*The Estate of Carson Bride, et al. v. Yolo Technologies Inc., et al.*
THIRD AMENDED COMPLAINT

15.    Plaintiff the Estate of Carson Bride is the estate of Carson Bride, who at all relevant times was an Oregon resident prior to his death on June 23, 2020 at the age of 16. Carson Bride was a YOLO user from on or before January 23, 2020 to June 23, 2020. Before he began using YOLO, Carson Bride downloaded onto his phone the YOLO app that Yolo designed, developed, manufactured, distributed, and delivered to him.

16.    At all relevant times, Plaintiff Kristin Bride was an Oregon resident. She brings this action as the appointed administrator of the Estate of Carson Bride and on behalf of herself as an individual.

17.    At all relevant times, Plaintiff Addison Kennedy (A.K. hereinafter)was a Colorado resident. She was  a minor throughout the relevant times that she was using YOLO in 2019. Before she began using YOLO, A.K. downloaded onto her phone the YOLO apps that Yolo designed, developed, manufactured, distributed, and delivered to her.

18.    At all relevant times Plaintiff Amber Casperson ("A.C." hereinafter) has been a Minnesota resident. She was a minor child when she began using YOLO in 2019. Before she began using YOLO, A.C. downloaded onto her phone the YOLO app that Yolo designed, developed, manufactured, distributed, and delivered to her. At all relevant times Plaintiff A.O. has been a Pennsylvania resident. She is 16 years old and began using YOLO in or

7

around 2019. Before she began using YOLO, A.O. downloaded onto her phone the YOLO app that Yolo designed, developed, manufactured, distributed, and delivered to her. Plaintiff A.O. and her legal guardian Jane Doe 3 request that this Court permit them to proceed under pseudonyms ("A.O." and "Jane Doe 3" respectively). If required by the Court, they will seek permission to proceed under the pseudonyms. The use of pseudonyms is necessary to preserve privacy in a matter of sensitive and highly personal nature given that the allegations detailed herein relate to A.O.'s experience as a victim of cyberbullying with sensitive personal information that would humiliate or embarrass minor child. A.O.'s sensitive and personal experiences were not the result of any voluntary undertaking on her part, and neither the public, nor the defendants, will be prejudiced by her identity remaining private.

19.

20.    Upon information and belief, Defendant Yolo Technologies, Inc. (formerly Popshow, Inc.) is a Delaware corporation with its headquarters and principal place of business in Los Angeles, California. Yolo's only operations in the United States are located in Los Angeles, California. Yolo Technologies, Inc. is the developer of the app YOLO. Yolo sells, transfers, and services its product, the YOLO app, to consumers in exchange for their

8

time, attention, and personal data. YOLO is an app designed to allow its users to send messages to each other anonymously. Predominantly used by teens, YOLO allows teens to chat, exchange questions and answers, and send polling requests to one another on a completely anonymous basis—that is, the receiver of a message will not know the sender's account names, nicknames, online IDs, phone numbers, nor any other identifying information unless senders "reveal" themselves by "swiping up" in the app. Until YOLO was banned by Snap in 2021, YOLO operated on "Snap Kits," which allowed hundreds of millions of Snap users to access YOLO via Snapchat.

21.    At all times relevant to this Complaint since 2019 to date, Gregoire Henrion was the Co-Founder, CEO, and sole employee of YOLO. Upon information and belief, Gregoire Henrion directly authorized, directed, made decisions upon, designed, and created YOLO app, possessed full knowledge and control over YOLO's misrepresentations and harms now alleged in this complaint by Plaintiffs, and was directly and knowingly involved in YOLO's operations and decisions including all of those pertinent to this case as alleged herein. Upon information and belief, Gregoire Henrion personally benefitted from the claims in this action brought against YOLO.

22.    Each claim in this action that is brought against Yolo is also brought against the Defendant Does 1-10, each of whom is the agent, servant, partner, joint-venturer, co-venturer, "media partner," principal, director, officer, manager, employee, or shareholder of one or more of its co-defendant(s) who aided, abetted, controlled, and directed or conspired with and acted in furtherance of said conspiracy with one or more of its co-defendant(s) in said co-defendant(s) performance of the acts and omissions described below. The plaintiffs sue each of these Doe defendants by these fictitious names because plaintiffs do not know these defendants' true names and capacities. Despite reasonable efforts, the plaintiffs have not been able to ascertain the identity of DOES 1-10.

## JURISDICTION AND VENUE

23.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2), because the matter in controversy, exclusive of interest and costs, exceeds $5,000,000, and is a class action in which some members of the class are citizens of states different from the states where Defendants are citizens. All of the named plaintiffs in this action are citizens of a different state than Yolo, which is a citizen of California and/or Delaware.

10

24.     In addition, as to each of the named plaintiffs, there is subject matter jurisdiction under 28 U.S.C. § 1332(a), because the value of each named plaintiff's claims exceeds $75,000, and there is complete diversity between each named plaintiff, on the one hand, and Yolo, on the other hand.

25.     There is general jurisdiction over Yolo, because Yolo's principal place of business is in this District and, in fact, all of its United States-based operations and employees are located in this District. There is also specific jurisdiction over Yolo, because Yolo developed, marketed, created, and operated the YOLO app in this District and connected to its users, including several of the plaintiffs, from its operations in this District.

26.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1), because Yolo resides in this District. Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b)(2), because many of the acts and transactions giving rise to this action occurred in this District, where Yolo developed, manufactured, marketed, and operated YOLO.

## **FACTUAL ALLEGATIONS**

### **YOLO AND DEFENDANTS WERE AWARE THAT ANONYMOUS MESSAGING APPS ARE INHERENTLY AND UNREASONABLY DANGEROUS FOR MINORS**

27.     For at least the past decade it has been known that anonymous online messaging and communications pose significant risks and cause grave harms

11

to minors, with numerous teens committing suicide because they were bullied and harassed on anonymous messaging apps. Those risks and harms have been widely identified in news reports, academic studies, petitions from concerned parents, and consumer reports to technology companies. And Yolo was aware of, and should have been aware of, the problem that other anonymous apps had with bullying when they launched their apps in 2019.

28.    Studies have shown that anonymous communications increase the risk of aberrant behavior and that such behavior is more likely to go unchecked due to the same anonymity. When anonymity is involved in communications, it reinforces depersonalization, which leads to an increase in antinormative behavior (like bullying and harassment) and a decrease in bystander intervention. A well-regarded study found that "the perceived anonymity of the bystander [was] negatively related to their propensity to intervene."[4] And the perceived invisibility of the communicators often leads to antinormative behavior" because the anonymity reinforces "depersonalization" (*i.e.*, the inability to tell "who is who" online). "[D]epersonalization" happens in "online environments in which people are interacting with people they

_____

[4] N. Brody & A.L. Vangelisti, *Bystander Intervention in Cyberbullying*, COMMUNICATION MONOGRAPHS, 83:1, 94 (2016).

*The Estate of Carson Bride, et al. v. Yolo Technologies Inc., et al.*
THIRD AMENDED COMPLAINT

already know in a face-to-face context," as opposed to the traditional sense of anonymity where people may be complete strangers to one another.[5]

29.    Another study on anonymity and cyberbullying found that "[a]nonymity has a more negative impact on the victim. Adolescents believed that the anonymous situation is more serious and has more of a negative impact on the victim."[6] The negative feelings that a victim feels is amplified when the bullying is anonymous, because the aggressor's intentions and perceptions are even more difficult to determine. Moreover, as the study explained, adolescents believe that anonymity allows individuals to behave in ways they might not otherwise (*e.g.*, engage in cyberbullying) since they can remain anonymous and have more power.[7]

30.    Leading experts on the causes and effects of bullying have found that anonymous apps are a "'one-stop shop for the bully' because everything they

_____

[5] *Id.* (earlier version of the study available at https://www.natcom.org/sites/default/files/pages/NCA_Anti-Bullying_Resources_Brody.pdf, p. 20.)

[6] B. Mascotto, *Exploring the impact of anonymity on cyberbullying in adolescents: an integrative literature review*, UNIVERSITY OF VICTORIA (2015), available at https://dspace.library.uvic.ca/bitstream/handle/1828/5986/Mascotto_Brooke_MN_2015.pdf?sequence=1&isAllowed=y.

[7] *Id.*

*The Estate of Carson Bride, et al. v. Yolo Technologies Inc., et al.*
THIRD AMENDED COMPLAINT

need is there: an audience, anonymity, an emphasis on appearances, and channels that range from public feeds to behind-the-back group chats."[8]

31.    The significant risks to minors have translated into major harms whenever anonymous app has launched in the past, often with bullying and harassment causing teenagers to take their own lives.

32.    For example, in 2010, 17-year-old Alexis Pilkington of Long Island, New York was cyberbullied on *Formspring.me*, an anonymous question and answer site, and then ended her own life.[9]

33.    In 2011, 15-year-old Natasha MacBryde of Worcestershire, U.K., took her own life shortly after receiving threatening anonymous messages on *Formspring.me*, which her family believed to be a significant contributor to her death.[10]

34.    In 2011, 14-year-old Jamey Rodemeyer of Buffalo, New York took his life after receiving slurs on *Formspring.me* from anonymous senders.[11]

_____

[8] Katy Steinmetz, *Inside Instagram's War on Bullying*, TIME, July 8, 2019, https://time.com/5619999/instagram-mosseri-bullying-artificial-intelligence/

[9] *Town angry over Net slurs at suicide victim*, NBC NEWS, March 26, 2010, at https://www.nbcnews.com/id/wbna36058532

[10] *Natasha MacBryde: Rail death teen threatened online*, BBC.COM, July 21, 2011, at https://www.bbc.com/news/uk-england-hereford-worcester-14239702

[11] *Jamey Rodemeyer Suicide: Police Consider Criminal Bullying Charges*, ABC NEWS, September 21, 2011, at https://abcnews.go.com/Health/jamey-rodemeyer-suicide-ny-police-open-criminal-investigation/story?id=14580832#.UXfKtrU3uSo

14

*The Estate of Carson Bride, et al. v. Yolo Technologies Inc., et al.*
THIRD AMENDED COMPLAINT

35.    In 2012, 13-year-old Ciara Pugsley of Leitrim, Ireland took her own life after being cyberbullied on an anonymous website, *ask.fm*.[12]

*36.*    In 2015, 18-year-old Elizabeth Long was recovering from an attempted suicide and, while using the anonymous Yik Yak app, she received anonymous messages telling her that she should kill herself. Seeing the danger of anonymous apps first-hand, Ms. Long launched a petition on Change.org to have the anonymous app Yik Yak removed from the Apple Store and Google Play. Her petition was signed by 83,363 individuals.[13]

37.    Unfortunately, later that year, Jacob Marberger, another teenager who was anonymously cyberbullied on Yik Yak, ended his own life. The "tipping point" for Jacob, who had been socially ostracized after making a sexual harassment complaint against other students, was when students were anonymously bullying him on Yik Yak.[14]

*38.*    In 2017, George Hessay of Rawcliffe, East Yorks, U.K., took his own life after suffering abuse on an anonymous messaging app called Sayat.me in

---

[12] *Third suicide in weeks linked to Cyberbullying*, IRISH EXAMINER, Oct. 29, 2012, at https://www.irishexaminer.com/news/arid-20212271.html

[13] *Shut Down the app "Yik Yak"*, CHANGE.ORG, at https://www.change.org/p/tyler-droll-and-brooks-buffington-shut-down-the-app-yik-yak

[14] *Student's Suicide Prompts Investigation of College's Culture, Yik Yak*, NBC PHILADELPHIA.COM, Dec. 3, 2015, https://www.nbcphiladelphia.com/news/local/task-force-washington-college-jacob-marberger-bullying-social-media-yik-yak/157654/

15

---

*The Estate of Carson Bride, et al. v. Yolo Technologies Inc., et al.*
THIRD AMENDED COMPLAINT

which users could seek anonymous feedback from others online. George took his own life just days after he was told "to kill himself" by an anonymous user. His death led to the closure of the site in the United Kingdom.[15]

39.     Another app with anonymous messaging, Sarahah, came under public scrutiny for the harassment and bullying teenagers faced on that app. In 2018, a parent witnessed her 13-year-old daughter receive an anonymous message on *Sarahah* from a user who wrote: "I hope she kills herself." The parent started a *Change.org* petition that was signed by 466,714 supporters. *Sarahah* was removed from Apple and Google app stores after reported instances of severe cyberbullying became known to the public.[16]

40.     When Yolo launched its anonymous messaging apps in 2019, it was aware that this type of bullying and harassment was prevalent on prior anonymous messaging apps and that efforts to prevent bullying and harassment on those apps had been unsuccessful.

**THERE IS A DIRECT LINK BETWEEN THE TYPE OF CYBERBULLYING THAT ANONYMOUS APPS FOSTER AND TEEN SUICIDE, BUT TEENS, SCHOOL**

---

[15] Paul Sims, *BULLIED TO DEATH Boy, 15, took own life after vile anonymous bully on Sayat.me app urged him to 'kill himself*, The Sun (Aug. 8, 2019), https://www.thesun.co.uk/news/9682834/boy-took-own-life-bully-sayat-me-app-rawcliffe/

[16] *Ban apps like Sarahah where my daughter was told to "kill herself"*, CHANGE.ORG, https://www.change.org/p/app-store-google-play-ban-apps-like-sarahah-where-my-daughter-was-told-to-kill-herself?redirect=false

*The Estate of Carson Bride, et al. v. Yolo Technologies Inc., et al.*
THIRD AMENDED COMPLAINT

**OFFICIALS, AND PARENTS HAVE DIFFICULTY STOP BULLYING THAT IS MASKED BY ANONYMITY**

*41.*   The risks of anonymous messaging apps are severe for minors, because there is a well-established link between cyberbullying and teen suicide, and also because minors are ill-equipped to stop cyberbullying.

*42.*   Students who experience cyberbullying and other bullying are nearly two times more likely to attempt suicide as other students.[17] And victims of cyberbullying are at a greater risk than non-victims of both self-harm and suicidal behaviors.[18]

*43.*   According to a Pew Research Center survey, 59% of U.S. teenagers have been bullied or harassed online. And 80% of teenagers believe that online platforms and messaging apps don't do enough to prevent bullying and harassment online.[19]

---

[17] Hinduja, Sameer & Patchin, *Bullying, Cyberbullying, and Suicide.* ARCHIVES OF SUICIDE RESEARCH : OFFICIAL JOURNAL OF THE INTERNATIONAL ACADEMY FOR SUICIDE RESEARCH (2010), available at https://www.researchgate.net/publication/ 45289246_Bullying_Cyberbullying_and_Suicide.

[18] John A, Glendenning AC, Marchant A, Montgomery P, Stewart A, Wood S, Lloyd K, Hawton K, *Self-Harm, Suicidal Behaviours, and Cyberbullying in Children and Young People: Systematic Review*, J MED INTERNET RES (2018);20(4):e129 doi: 10.2196/jmir.9044

[19] *A Majority of Teens have Experienced Some Form of Cyberbullying*, PEW RESEARCH CENTER (Sept. 27, 2018), https://www.pewresearch.org/internet/2018/09/27/a-majority-of-teens-have-experienced-some-form-of-cyberbullying/

*The Estate of Carson Bride, et al. v. Yolo Technologies Inc., et al.*
THIRD AMENDED COMPLAINT

*44.*    Despite the prevalence of cyberbullying, teens do not feel empowered to stop it and they are poorly positioned to do so. This is because on anonymous apps such as YOLO that mask the identities of aggressors, teens are unable to identify their aggressors, leaving victims helpless, frustrated, isolated, anxious and mentally tortured with the notion that their aggressors may be lurking anywhere.

*45.*    While uncertain about the identity of their aggressors, teens feel uneasy about reporting to adults and school officials, because they fear the reporting will cause the bullying to exacerbate or that their aggressors will retaliate.[20] Teens also fear that they will get into trouble themselves if they had already been warned to stay off electronic devices or social media, and that adults will then restrict their access to their mobile devices.[21]

46.    The problem of cyberbullying and the lack of intervention are even greater problems now that teens are spending much more time online than prior generations. During the COVID-19 pandemic, as of June 2020, 62 percent of parents of U.S. teens aged 14-17 years stated that their children were spending more than 4 hours per day on electronic devices, nearly a

---

[20] *Id.*

[21] *Why Victims of Bullying Often Suffer in Silence* (Feb. 27, 2021), VERYWELL FAMILY, https://www.verywellfamily.com/reasons-why-victims-of-bullying-do-not-tell-460784

two-fold increase compared to the pre-pandemic times when only 32 percent of parents of U.S. teens aged 14-17 years were spending more than 4 hours per day on electronic devices.[22] Upon information and belief, YOLO and thrived and its owners profited throughout the pandemic because of the surge of users' time spent on their apps.

**WHEN YOLO LAUNCHED YOLO IN 2019, INSTEAD OF RESPONSIBLY WARNING ITS USERS ABOUT THE GRAVE DANGER OF ANONYMOUS MESSAGING FOR MINORS, YOLO MISLED ITS USERS ABOUT THE STEPS IT WOULD TAKE TO PROTECT THEM FROM BULLYING AND HARASSMENT ON YOLO.**

*47.*    As described above, historical and recent experience with anonymous messaging apps has shown that such apps are inherently dangerous to minors, because anonymity significantly incentivizes antinormative behavior like bullying and harassment and disincentivizes intervention against such behavior. Despite the apparent danger and obstacles to making anonymous messaging safe for minors, Yolo nonetheless developed, manufactured, created, distributed, and operated an anonymous messaging app that were not reasonably safe for minors and provided them to millions of users.

*48.*    In May 2019, Yolo launched the newest anonymous messaging app in the marketplace. The app's key features were very similar to prior anonymous messaging apps that resulted in massive amounts of bullying: it

---

[22] *Internet Demographics and Use*, STATISTA, https://www.statista.com/statistics/1189204/us-teens-children-screen-time-daily-coronavirus-before-during/

*The Estate of Carson Bride, et al. v. Yolo Technologies Inc., et al.*
THIRD AMENDED COMPLAINT

allowed users to ask questions and have users anonymously respond, to send polling requests on a completely anonymous basis, and to chat with other users anonymously. Unless a sender of a communication agreed to reveal her identity, other users would not know the sender's account names, nicknames, online IDs, phone numbers, or any other identifying information.

49.    Like other anonymous messaging apps that quickly reached large numbers of teens, in YOLO's first week it became the top downloaded app in America,[23] and 11 months later the app had 10 million active users.[24]

50.    Despite the massive and rapid expansion of its userbase, Yolo stated in a sworn declaration in this case that it had, as of 2021, fewer than 10 employees. *See* Henrion Declaration, ECF No. 31-3. Yolo knew or should have known at that point, and earlier in 2020 when Yolo reached 10 million daily active users, that it could not possibly provide meaningful safeguards to so many active users—including the safeguards Yolo told its users and users' parents it would implement—given that it had fewer than 10 employees.

_____

[23] Josh Constantine, *#1 app YOLO Q&A is the Snapchat platform's 1st hit*, TechCrunch.com (May 8, 2019), https://techcrunch.com/2019/05/08/download-yolo-app/.

[24] Josh Constantine, *Teen hit Yolo raises $8 million to let you Snapchat anonymously: Can it stop the trolls?*, TechCruch.com (February 28, 2020), https://techcrunch.com/2020/02/28/anonymous-snapchat-group-chat-yolo/.

*The Estate of Carson Bride, et al. v. Yolo Technologies Inc., et al.*
THIRD AMENDED COMPLAINT

*51.*      When Yolo launched YOLO in May 2019, Yolo marketed YOLO to minors and allowed minors to use the YOLO app without verifying or attempting to verify the age of its users. And several months after launching, Yolo changed the age rating for the YOLO app to 17 and older, again without doing anything to verify the ages of its users.

*52.*      On the Google Play store, YOLO is accompanied by a "Teen" content rating, intentionally focusing its marketing and solicitation toward teenagers.[25] According to Google Play Help, the content ratings in the app store "are the responsibility of the app developers." And users are not required to input their date of birth or engage in an age verification process when they sign up for YOLO.



---

[25] Google Play Help, *Apps & Games Content Ratings on Google Play*: https://support.google.com/googleplay/answer/6209544?p=appgame_ratings&visit_id=637560335067969325-3904586056&rd=1

---

*53.*    When Yolo launched YOLO it knew or should have known that anonymous messaging would be inherently dangerous for minors, especially given the history of suicide by teens who were bullied on anonymous messaging apps and the prevalence of bullying on such apps.

*54.*    Despite knowing of the dangers to minors that anonymous apps would cause, Yolo made false and deceptive statements to users when they signed up about the steps Yolo would take to make the app safer.

*55.*    When a user first opens YOLO after downloading it from the Apple or Google app store, a pop-up notice fills the screen and tells each prospective user: "YOLO has no tolerance for objectionable content or abusive users. You'll be banned for any inappropriate usage." Every user of YOLO, including Plaintiffs Carson Bride, Kristin Bride, A.K., A.C., and A.O., read this statement and relied on it when they used YOLO.

*56.*    On the first screen of the user's interface with the YOLO app, YOLO states: "YOLO is for positive feedback only. No bullying. If you send harassing messages to our users, your identity will be revealed." Every user of YOLO, including Plaintiffs Carson Bride, A.K., A.C. and A.O. read this statement and relied on it before they began using YOLO.

*The Estate of Carson Bride, et al. v. Yolo Technologies Inc., et al.*
THIRD AMENDED COMPLAINT

⚠️ YOLO is for positive feedback only. No bullying. If you send harassing messages to our users, your identity will be revealed.

Send anonymous messages to

Type your anonymous message here

Send anonymously

57.    In a similar statement made prominently to all YOLO users when they sign up for YOLO, YOLO's App Store page also states: "Be kind, respectful, show compassion with other users, otherwise you will be banned." Upon information and belief, every user of YOLO, including Plaintiffs Carson Bride, A.K., A.C. and A.O. read this statement and relied on it before they began using YOLO.



23

58.     Thus, in the most visible places when users signed up for YOLO, Yolo falsely represented that its app would take concrete actions to implement safety measures—namely that abusive users' identities would be revealed and their accounts would be banned—and that there would be "no tolerance for objectionable content or abusive users."

**YOLO'S REPRESENTATIONS WERE FALSE AND YOLO WAS A HOTBED FOR CYBERBULLYING AND ABUSE OF TEENS**

59.     All of the representations by Yolo described in paragraphs 63 to 67 were false, misleading, and deceptive. Contrary to those representations, from the earliest days that YOLO was operational through the time that YOLO was banned by Snap, YOLO routinely did not reveal the identifies of abusive users, nor did YOLO ban those users, even after abusive users were reported to the app. And there was great tolerance for such objectionable conduct as opposed to the "zero tolerance" that was represented by Yolo.

60.     In fact, when YOLO users reported other users who were sending bullying or harassing messages, including to YOLO's "Contact Us" email, YOLO regularly did not respond to their inquiries or take any action in response to them.

61.     The representations described above were material to each of the named plaintiffs who used YOLO, because, among other things, they falsely

24

---

created an understanding of the specific things Yolo would do to protect their safety on the app and they created a more general understanding that YOLO would be safe space. And those representations were relied upon by each of the plaintiffs when they decided to sign up for and use YOLO.

*62.*    Yolo has routinely ignored requests by consumers to reveal the identity of or ban users who engaged in harassing or bullying behavior, even when users have reported death threats and suicidal thoughts in their reviews of YOLO on the app store on which YOLO regularly updates its information. As user reviews of YOLO from the Apple Store explain:

a.    ******, 09/13/2020: "This app does not prevent bullying. It says above every YOLO question that any user will get banned from the app if they say anything considered as bullying. Well, I am very disappointed because I have seen more than enough users' telling children to "kill themselves." I personally know one child that had these messages coming in repeatedly for months, and is still getting them to this day. The child had even had many suicidal thoughts and actions."

b.    *****, 05/16/2019: "I've gotten disgusting messages that I've reported and waited to see whose name it would be so I know on my Snapchat who to delete but how would I know if they don't reveal the names instantly. When I reported this issue I pressed the report button and the conversation deleted but no name shows up so I still believe that whoever is on my Snapchat is still on my friends list . . ."

c.    ******dove, 3/25/2020: "it says that only positive messages are allowed and that if you bully or harass someone you will be banned from yolo. But I have gotten messages where I have been bullied and that person was not banned. . ."

*The Estate of Carson Bride, et al. v. Yolo Technologies Inc., et al.*
THIRD AMENDED COMPLAINT

d.      ******, 11/18/2019: "My daughter has been getting bullied on this app and we report/block, and this bully keeps on going and it's about suicide! . . . If someone truly reports someone this nasty on the app, it should be dealt with instantly!!"

e.      Briggs ****, 02/17/2020: "At a time when suicide is the number 1 killer of teens in America, we definitely don't need apps like this where bullied haters can hide behind a screen . . ."

f.      Ieila****: 01/14/2021: "Honestly, the hate and death threats . . . on this app should be immediately taken care or when we report something someone has anonymously said."

g.      Uhohsp***: 08/10/2020: "In a few group chats people have been using the ghost messages to cyberbully people by calling them fat, ugly, gross and such and sometimes even to kill themselves. . . I think it would be practical that if someone sends an outrageous message like that, getting flags would result in a ban? . . .  these messages hurt. I am a pre-teen and I know kids my age are going to take these comments personally. I just want everyone to stay safe."

h.      Nicole *******, 09/29/2019: "it's teaching our youth that it's okay to hide behind a screen and bully. So if someone want to say something nice, they should say it to them directly, not through an anon[ymous] messaging app where people are constantly getting hurt and bullied[.]"

*63.*    Although it was not possible for Yolo to have made YOLO reasonably safe for minors, because of the inherent danger of anonymous messaging for minors and the significant technological obstacles, Yolo's regular failure to take the concrete actions that it told its users it would take to unmask or ban abusive users increased the risk that YOLO's users would experience cyberbullying and harassment.

*The Estate of Carson Bride, et al. v. Yolo Technologies Inc., et al.*
THIRD AMENDED COMPLAINT

**CARSON BRIDE EXPERIENCED SEVERE CYBERBULLYING ON YOLO WHICH LED TO HIS DEATH AT THE AGE OF 16**

*64.*    According to his family and friends, Carson Bride was a teenager who had "an infectious smile that would brighten everyone's day." When he passed away from suicide on June 23, 2020, he was 16 years old and had just completed his sophomore year in high school. He was a caring and compassionate teenager who taught ski classes to children during winters.

*65.*    Carson took his own life by hanging himself at his home on the morning of June 23, 2020.

*66.*    On or about July 4, 2020, it was revealed that Carson had been bullied on YOLO prior to his suicide.

*67.*    After Carson ended his life, two psychologists who provided care to Carson and his family opined that Carson's suicide was likely triggered by cyberbullying.

*68.*    Carson's parents did not consent, nor were present, when their son Carson downloaded the Defendants' apps. To the extent that Yolo asserts that it entered into any contract or agreement with Carson Bride, a minor who lacked capacity to enter into a contract or agreement with Yolo at that time, Carson's mother, Kristin Bride, on behalf of her deceased son Carson

*The Estate of Carson Bride, et al. v. Yolo Technologies Inc., et al.*
THIRD AMENDED COMPLAINT

Bride, hereby disaffirms any such contract or agreement between her son and Yolo.

69.    All of the other minor plaintiffs in this action likewise disaffirm any contract or agreement with Yolo.

70.    From January 23, 2020 to June 22, 2020, Carson received at least 105 messages via the YOLO app. He received 35 anonymous messages between January 23, 2020 and January 29, 2020. Carson received 13 anonymous messages from May 25, 2020 to May 31, 2020. The anonymous messages Carson received surged from June 7, 2020 to June 22, 2020, just prior to his death, during which time Carson received 57 messages from anonymous users on the YOLO app.

71.    Of these 105 anonymous messages, 62 messages included content that was meant to humiliate Carson, often involving sexually explicit and disturbing content.

72.    On May 31, 2020, messages sent to Carson included the following threats: "Remember when someone threatened to push u [Carson] into the Grand Canyon, that shit was so funny" and "I'm gonna push u [Carson] into the Grand Canyon."

73.    Later, on June 7, 2020, Carson received the following messages after an incident where he had fainted during his biology class: "When u passed

out in Biology I put my balls in ur mouth" and "When you passed out I ate your ass."

74.     Upon information and belief, 27 out of 105 YOLO messages involved catfishing, a deceptive activity where a person creates a fake identity on a social platform, usually targeting a specific victim for abuse. These messages are also sexually explicit in nature, such as "are you a virgin"; "I WANT YOUR WEINER NOWWWW" and "Sometimes I print ur face out and throw darts at it . . . but others I just want ur tender love in the night." Upon information and belief, on June 7, 2020, after receiving numerous abusive, harassing, and upsetting messages on YOLO, Carson searched YOLO's website and other websites searching for "YOLO reveal," "YOLO username reveal hacks," and other keyword searches in an effort to find out who was sending abusive messages to him.

75.     Carson relied on YOLO's representation that Yolo would reveal the identities of abusive users and ban them when he signed up to use YOLO.

76.     In responding to numerous abusive messages, Carson asked the anonymous users sending him abusive messages to voluntarily "S/U" (Swipe Up) to reveal their identities. None of the users chose to reveal themselves.

77.     On or about June 13, 2020, 10 days before his death, Carson asked a friend via a text message about the identities of the anonymous senders: "Do

*The Estate of Carson Bride, et al. v. Yolo Technologies Inc., et al.*
THIRD AMENDED COMPLAINT

you know who is sending me all these sus(picious) YOLOs. Whenever I do one I only get people either trying to catfish me or bait me into saying dumb (things) or whatever . . . I guess I understand like a bit of sus(picious) shit every once in a while but it [is] my entire inbox of YOLO's."

78.    On June 21 and 22, 2020, Carson posted his final Snapchat story about starting a summer job at Papa Murphy's pizza restaurant: "Pull up to Papa Murphy's at 3-5 on Wednesday [i]f you wanna see me working"; "Come to Papa Murphy's and order Pizza."

79.    On June 21 and 22, 2020, Carson received anonymous responses to his Snapchat story via YOLO: "why do you make my peepee so hard"; "How big is your penis"; and "How big are your balls."

80.    Upon information and belief, on June 23, 2020, the morning of Carson's death, the last web history found from his phone shows that Carson was again searching "Reveal YOLO Username Online," which reflects his final painstaking attempt to find out who was sending abusive anonymous messages to him on the YOLO app.

**YOLO REFUSED TO RESPOND TO KRISTIN BRIDE'S REQUEST TO UNMASK AND BAN CARSON'S ABUSERS OR HER INQUIRIES ABOUT HER SON'S DEATH**

81.    On or around July 6, 2020, two weeks after Carson's death, his parents Kristin and Tom Bride contacted Yolo. Using the Contact Us form on

*The Estate of Carson Bride, et al. v. Yolo Technologies Inc., et al.*
THIRD AMENDED COMPLAINT

YOLO's Customer Support page, Kristin and Tom wrote about the cyberbullying that occurred on YOLO and their son's resulting death.

82.    In the message to YOLO, Kristin and Tom Bride conveyed the urgency about this topic, expressing that YOLO must reveal the abusive users' identities to protect other children against the same bullying and harm that her son experienced on the YOLO app.

83.    To date, YOLO has not responded.

84.    On September 26, 2020, approximately three months after Carson's death, Carson's parents again sent an email entitled "Our Son's Suicide – Request for Help" to the law enforcement email address (lawenforcement@onyolo.com) provided by YOLO for reporting emergencies. Carson's parents expected that sending an email to the "law enforcement" address might prompt a timely response.

85.    In the email, Carson's parents included details about the abusive messages that anonymous users had sent to Carson on YOLO prior to his death. In addition, Carson's parents wrote:

Clearly, no one was policing YOLO when my son received hundreds of abusive messages during the first 3 weeks of June. These offenders may very well be continuing their bullying practices, especially now that they know the power of their words. For this reason, we are requesting the contacts of every SnapChat/YOLO anonymous user who sent a message to my son's SnapChat account [] during the month of June 2020 . . . If you create an app which provides a

31

platform for the anonymous bullying of vulnerable teens, the very least you can do is take accountability and assist the parents of your app's victims so that more YOLO deaths do not occur.

86.    The email that Kristin and Tom Bride sent to the [lawenforcement@onyolo.com](mailto:lawenforcement@onyolo.com) address immediately bounced back and displayed the following error message: "The following recipient(s) cannot be reached" due to "invalid address."

87.    Yolo again misrepresented and/or implied that it would provide users a way to contact them to report any issues that relate to law enforcement, when, in fact, YOLO did not even maintain such an email account.

88.    Kristin Bride simultaneously sent the same message to YOLO's Customer Support, but her email was returned with an automated response, stating "We're currently checking your message and will respond as soon as we can."

89.    To date, no one from YOLO's Support Team has responded.

90.    On December 16, 2020, Kristin once again tried to reach YOLO's team through the help of Josh Golin, Executive Director of the Campaign for a Commercial-Free Childhood, who directly contacted Gregoire Henrion (the Co-founder and CEO of YOLO) through LinkedIn, a social media site for professional networks, demanding that YOLO provide a response to Kristin and Tom Bride.

32

*91.* To date, no one from YOLO has responded.

*92.* On December 30, 2020, Kristin again contacted YOLO's team through YOLO's "Contact Us" form and email (lawenforcement@onyolo.com).

*93.* To date, no one from Yolo has responded.

*94.* Contrary to its representations in its Terms of Use and other policies, Yolo failed to protect, communicate, and respond to reports from its teen users and their parents.

*95.* Reasonably relying on the misrepresentations of Yolo with respect to its protection of users, Kristin Bride used Yolo's service and as a result suffered an injury.

*96.* Kristin Bride is therefore entitled to compensatory damages for physical and emotional pain and distress in the amount that the jury may determine fair and reasonable.

*97.* Kristin Bride is also entitled to injunctive relief and punitive damages for the gross, continued, and callous misrepresentations and non-response of Yolo even after being notified of Carson's death multiple times.

**A.K.'S EXPERIENCE WITH YOLO**

33

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*98.*    A.K. started using YOLO during or around September 2019, when she was a minor, and used YOLO until it was suspended by Snap in May 2021.

*99.*    A.K. relied on YOLO's representation that Yolo would reveal the identities of the aggressors and ban abusive users when she signed up to use YOLO.

*100.*    A.K. received numerous bullying anonymous messages on YOLO. The messages included statements like "[A.K.] does drugs," which is false; "I hope you die"; and "I'm gonna kill you."

*101.*    In addition, after A.K. shaved her head to donate her hair to Locks for Life, an organization that makes wigs for people who have lost their hair during cancer treatment, numerous YOLO users posted anonymous messages to create a false rumor that she had cancer. And other users mocked her for her appearance—messages such as "Mr. Clean," "Weird shaped head" and "Bald"—and accused her of shaving her head and "faking cancer" just "for attention".

102.    A.K. tried to identify the people who bullied her on YOLO, because she wanted to confront them. But because the YOLO messages were anonymous, it was impossible for her to find out who sent those messages.

*The Estate of Carson Bride, et al. v. Yolo Technologies Inc., et al.*
THIRD AMENDED COMPLAINT

103.   A.K. sent a request to Yolo via the YOLO Contact Us form in which she asked Yolo to unmask the people who bullied her, but she never received a response to her inquiry and request. This caused A.K. frustration and emotional suffering.

104.   The anonymous messages that A.K. received on YOLO made her consider whether she should kill herself and give into what other people were saying about her. It lowered her self-esteem for years. It altered her eating habits. And it made her feel worthless and like a waste of space and a life. A.K.'s emotional and psychological harm was caused by Yolo's anonymous apps and misrepresentations, including Yolo's failure to fulfill its promise of unmasking the people who bullied A.K.

**A.C.'S EXPERIENCE WITH YOLO**

*105.*   A.C. started using YOLO during or around August 2019, when she was only 13 years old.

*106.*   A.C. relied on Yolo's representation that Yolo would reveal the identities of the aggressors and ban abusive users when she signed up to use YOLO.

*107.*   In 2020, six teenagers from A.C.'s school district, including her older brother and his close friend, had taken their own lives. Teenagers in her area

*The Estate of Carson Bride, et al. v. Yolo Technologies Inc., et al.*
THIRD AMENDED COMPLAINT

would encourage or threaten one another to kill themselves on social media and messaging apps.

108.   A.C. suffered the fatal loss of her 16-year-old brother, who took his own life on January 2, 2020, causing A.C. and her family excruciating pain and grief.

109.   After her brother's death, A.C. posted a story on Snapchat where she was depicted spending time with her friends. Immediately after that posting, A.C. received anonymous messages on YOLO that stated: "You look happy without your brother – you should go kill yourself too."

110.   Shaken, traumatized, and upset, A.C. tried to find out who was looking at her story in order to identify the sender of the YOLO message. But because the YOLO message was anonymous, it was impossible for her to find out who sent that message.

111.   In addition, on multiple occasions, A.C. received YOLO messages calling her "fat," which created insecurity about her body image and weight.

112.   Because of Yolo's actions, A.C. suffered severe emotional distress and diminished self-esteem.

113.   A.C. stopped using YOLO when she understood the danger of anonymous messaging apps and that Yolo's representations were not true.

**A.O. EXPERIENCE WITH YOLO**

114.    A.O. started using YOLO on or around May 2019 when she was a minor.

*115.*    A.O. relied on YOLO's representation that YOLO would reveal the identities of abusive users and ban them when she signed up to use YOLO.

116.    When A.O. used YOLO, there was a surge of rude messages and name-calling among her Snapchat friends through YOLO. For example, one of her friends had been targeted by anonymous YOLO messages where she was called "whore" and "boy-obsessed."

117.    During the pandemic, A.O. posted a question on YOLO: "What would we do if we could be in the same room?"

118.    A.O. received an anonymous message on YOLO: "We would have sex together." A.O. felt disgusted and replied, "No thanks."

119.    But because the YOLO message was anonymous, it was impossible for her to find out who sent that message.

120.    As a result of using YOLO's anonymous messaging app, A.O. experienced emotional suffering and diminished trust. She has been additionally aggrieved as she is unable to identify the senders of the messages. As far as she is aware, the person who sent her the message was not removed, banned or unmasked by Yolo.

*The Estate of Carson Bride, et al. v. Yolo Technologies Inc., et al.*
THIRD AMENDED COMPLAINT

121.   A.O. stopped using YOLO when she understood the danger of anonymous messaging apps and that Yolo's representations were not true.

## **CLASS ALLEGATIONS**

122.   The plaintiffs bring this action as a class action under Rule 23 of the Federal Rules of Civil Procedure and seek to certify the following National Class under Rule 23(a) and (b)(3):

All people who used YOLO from May 2019 to May 2021 when they were 13 to 17 years old, and all people who will use YOLO in the future (should YOLO renew its operations) through the date of judgment in this action.

123.   Excluded from the class are the defendants, the defendants' officers, directors, and employees, and the children of such people, the defendants' subsidiaries, the Judge to which this case is assigned, and the immediate family of the Judge to which this case is assigned.

124.   Membership in the class shall be determined based on Yolo's own records of persons who used Yolo during the class period.

125.   Plaintiff the Estate of Carson Bride seeks to represent an Oregon Subclass comprised of members of the National Class who resided in Oregon when they used Yolo.

126.   Plaintiff A.K. seeks to represent a Colorado Subclass comprised of members of the National Class who resided in Colorado when they used Yolo.

127.   Plaintiff A.C. seeks to represent a Minnesota Subclass comprised of members of the National Class who resided in Minnesota when they used Yolo.

128.   Plaintiff A.O. seeks to represent a Pennsylvania Subclass comprised of members of the National Class who resided in Pennsylvania when they used Yolo.

129.

**Rule 23(a)**

130.   The proposed National Class and Subclasses satisfy the requirements of Rule 23(a).

131.   The proposed National Class and Subclass are so numerous that the individual joinder of all its members, in this or any action, is impracticable. There are at least hundreds of thousands of members of the National Class who are located throughout the nation, and at least thousands of members of each Subclass, thereby making joinder impractical.

132.   Common questions of fact and law exist as to all Class Members. These include, but are not limited to, the following:

39

(a)    Whether Yolo misrepresented that it would reveal the names of users who engage in harassing or bullying behavior and ban those them?

(b)    Whether Yolo misrepresented that they had zero tolerance for bullying and harassing on its app,

(c)    Whether these representations were material?

(d)    Whether these representations were false, misleading, or deceptive?

(e)    Whether Yolo's conduct caused harm to the members of the National Class; and

(f)    Whether the plaintiffs and members of the National Class members are entitled to an injunction, damages, restitution, equitable relief and other relief deemed appropriate, and the amount and nature of such relief.

170.   The plaintiffs' claims are typical of the claims of the putative class members. The plaintiffs and all putative Class Members bring the same types of legal claims, based on the common pattern or practice of Yolo.

171.   The plaintiffs and their counsel satisfy the adequacy requirement. The plaintiffs will be adequate representatives of the proposed class because they are putative class members and they do not have interests that conflict with the interests of the putative Class Members.

40

172.   The plaintiffs' counsel are experienced in class action litigation and have litigated lawsuits of this complexity. They intend to prosecute this action vigorously for the benefit of the proposed Class.

**Rule 23(b)(3)**

173.   This action satisfies Rule 23(b)(3)'s predominance requirement. The central factual and legal questions regarding whether Yolo made misrepresentations about their safety precautions predominate over any individual questions in this litigation.

174.   This action also satisfies Rule 23(b)(3)'s superiority requirement. A class action is the superior method available for the efficient adjudication of this litigation, because the claims of the individual National Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against the defendants. Thus, it would be impracticable for the members of the Class to individually seek redress for the defendants' wrongful conduct. Class action treatment avoids the waste and duplication inherent in potentially thousands of individual actions and conserves the resources of the courts. In addition, the prosecution of separate actions by individual members of the Class would create a foreseeable risk of inconsistent or varying adjudications, which would establish incompatible results and standards for Yolo.

41

175.   This is the only action of which the plaintiffs are aware in which Yolo users are bringing claims against Yolo concerning the danger of anonymous messaging, and misrepresentations about its safety measures, or any related claims.

176.   It is desirable to concentrate the litigation against Yolo in this District, because there is jurisdiction over Yolo, there is proper venue in this District, and a single class action here will be more efficient than pursuing separate actions in other jurisdictions.

177.   This action is manageable as a class action.

## **CLAIMS**
### **COUNT I – FRAUDULENT MISREPRESENTATION**
Plaintiffs Estate of Carson Bride, Kristin Bride, A.K., A.C., and A.O. on behalf of the National Class against Yolo and Gregoire Henrion

178.   The plaintiffs adopt and incorporate by reference all allegations contained in the foregoing paragraphs as though fully set forth herein.

179.   Plaintiffs Estate of Carson Bride, Kristin Bride, A.K., A.C., and A.O., bring this claim for fraudulent misrepresentation against Yolo on behalf of themselves and the National Class.

180.   Yolo engaged in the common law tort of fraud or fraudulent misrepresentation.

181.   A defendant engages in fraudulent representation when it (1) made a false representation, (2) in reference to a material fact, (3) that the defendant made with knowledge of its falsity, (4) with an intent to deceive, and (5) reliance was taken based on the representation.

182.   As described above, when YOLO's users were signing up for YOLO, Yolo made material representations that it would take concrete actions to implement safety measures, namely that abusive users' identities would be revealed and their accounts would be banned, and that there would be "no tolerance for objectionable content or abusive users."

183.   As described above, those representations were false. From the earliest days that YOLO was operational through the time that YOLO was banned by Snap in 2021, YOLO routinely did not reveal the identifies of abusive users, nor did YOLO ban those users, even after abusive users were reported to Yolo. And there was great tolerance for such objectionable conduct, as opposed to the "zero tolerance" that was represented by Yolo. In fact, when YOLO users reported users who were sending bullying and harassing messages, including to YOLO's "Contact Us" email, YOLO regularly did not respond to their inquiries or take any action in response to them

184.   Yolo knew that those representations were false at the time they were made, when users signed up for, downloaded, and started to use YOLO.

43

185.   Yolo made these false representations with an intent to deceive Carson Bride, Kristin Bride, A.K., A.C., A.O., and members of the National Class into joining, downloading, and using YOLO.

186.   Yolo knew that Carson Bride, Kristin Bride, A.K., A.C., A.O., and members of the National Class would reasonably rely on these false representations in making the decision to join, download, and use YOLO. In particular, Yolo knew from news reports and customer reviews that representations identifying the specific measures that YOLO would take to prevent harassment and bullying would influence the decisions of teen users to join, download, and use YOLO, and the decision of parents to allow their children to use YOLO.

187.   Carson Bride, Kristin Bride, A.K., A.C., and A.O., and members of the National Class reasonably relied on Yolo's false representations in deciding to join and use YOLO. And they were deceived into believing that Yolo would take the steps that Yolo had represented it would take. For instance, in the months before his death, Carson Bride sought to have Yolo reveal the identifies of the people who had bullied and threatened him anonymously.

188.   Yolo also falsely represented that it had a system in place to respond to users' complaints about violations of its policies. In setting up a "Contact

44

Us" form and a "law enforcement" email address, Yolo represented to its users and others, including parents, that Yolo would respond to complaints about objectionable conduct on its platform. But this representation was false, because Yolo routinely did not respond to such inquiries and the "law enforcement" email address was not even active. And when Yolo made these statements, it knew that it did not have a system in place or the resources to regularly perform the actions that Yolo stated it would undertake, such as revealing and banning users who bullied or harassed other users.

189.  Yolo made this representation with knowledge of its falsity and with an intent to deceive users and other people, such as parents like Kristin Bride, into believing that Yolo would respond to their inquiries. And those persons did reasonably rely on Yolo's representations: they sent messages to the YOLO Contact Us form and the "law enforcement" email. For instance, A.K. sent a request to Yolo via the YOLO Contact Us form in which she asked Yolo to unmask the people who bullied her, but she never received a response to her inquiry and request. And Kristin Bride sent multiple inquiries to the Contact Us form and the "law enforcement" email seeking to unmask the people who had bullied and harassed her son Carson on Yolo. But YOLO did not respond to her inquiries.

190.   Yolo's fraudulent misrepresentations proximately caused harm to Carson Bride, A.K., A.C., A.O., Kristin Bride, and members of the National Class.

191.   Through these false representations, Yolo caused Carson Bride, Kristin Bride, A.K., A.C., A.O., and the National Class to use a product, YOLO, that was filled with bullying, harassment, and other objectionable conduct that Yolo had promised it would remove, including such misconduct that occurred even after users informed YOLO of it, and Yolo denied information to its users that would have helped them to identify and stop harassers and bullies.

192.   In investigating who was sending him the abusive messages and trying to learn their names, Carson Bride felt emotional distress and frustration.

193.   Yolo's misrepresentations about the Contact Us form and the "law enforcement" email caused Kristin Bride to engage in a painstaking, frustrating effort to learn the identities of abusive users sending harassing messages. Kristin suffered grief, frustration, anger, and helplessness.

194.   Yolo's fraudulent misrepresentations directly contributed to Carson Bride's wrongful death and contributed to Carson's and Kristin's emotional harm.

*The Estate of Carson Bride, et al. v. Yolo Technologies Inc., et al.*
THIRD AMENDED COMPLAINT

195.    The Estate of Carson Bride, Kristin Bride, plaintiffs A.K., A.C., and A.O., and members of the National Class are therefore entitled to compensatory damages for physical and emotional pain and distress, and the Estate of Carson Bride and Kristin Bride are entitled to pecuniary loss and loss of society, companionship, and services to Carson Bride's parents, and the cost of burial and memorial services, as the jury may determine fair and reasonable.

196.    The plaintiffs are entitled to punitive damages based on Yolo's willful and wanton actions in making these fraudulent misrepresentations.

## <u>COUNT II − NEGLIGENT MISREPRESENTATION</u>
Plaintiffs Estate of Carson Bride, Kristin Bride, A.K., A.C., A.O., on behalf of the National Class against Yolo and Gregoire Henrion

197.    The plaintiffs adopt and incorporate by reference all allegations contained in the foregoing paragraphs as though fully set forth herein.

198.    Plaintiffs Estate of Carson Bride, Kristin Bride, A.K., A.C., A.O. bring this claim for negligent misrepresentation against Yolo on behalf of themselves and the National Class.

199.    The Defendants committed the tort of negligent misrepresentation, the elements of which claim are that: (1) the defendant made a false statement or omission of a material fact, (2) the defendant was without reasonable grounds for believing the statement to be true, (3) the defendant

47

intended the plaintiff to rely on it (4) the plaintiff did reasonably relied on the false information, and (5) the defendant's challenged conduct proximately caused the plaintiff's harm.

200. As described in the prior count, Yolo made false representations that were material to Carson Bride, Kristin Bride, A.K., A.C., A.O., Kristin Bride, and the National Class; Yolo intended its users and other persons to rely on those statements in deciding to join, download, and use Yolo and to submit inquiries to Yolo; Carson Bride, A.K., A.C., A.O., Kristin Bride, and the National Class reasonably relied on those misrepresentations, and they experienced damages that were proximately caused by the defendants' misrepresentations.

201. In addition, as described above, Yolo lacked reasonable grounds for believing that the statements were true, and thus violated Yolo's duty of reasonable care to provide accurate information to its users. When Yolo made these statements, it knew or should have known that it did not have a system in place or the resources to regularly perform the actions that Yolo stated it would take, such as revealing and banning users who bullied or harassed other users.

*The Estate of Carson Bride, et al. v. Yolo Technologies Inc., et al.*
THIRD AMENDED COMPLAINT

202.   As described in the prior count, the plaintiffs who bring this count and the National Class are entitled to compensatory and punitive damages based on Yolo's misrepresentations.

## **COUNT III – UNJUST ENRICHMENT**

Plaintiffs Estate of Carson Bride, Kristin Bride, A.K., A.C., A.O., on behalf of the National Class against Yolo and Gregoire Henrion

203.   The plaintiffs adopt and incorporate by reference all allegations contained in the foregoing paragraphs as though fully set forth herein.

204.   Plaintiffs Estate of Carson Bride, Kristin Bride, A.K., A.C., A.O. bring this claim for unjust enrichment against Yolo on behalf of themselves and the National Class.

205.   Plaintiffs Estate of Carson Bride, Kristin Bride, A.K., A.C., A.O., and the putative National class, conferred a tangible economic benefit upon Yolo by signing up as a user to and downloading its app, sacrificing privacy rights and privileges, consuming advertisements, and providing their personal data.

206.   Through the profits gained by the sale of personal and non-personal information of YOLO users, Yolo reaped profits from their dangerous and defectively designed products and services, misrepresentations, and deceptive trade practices. Upon information and belief, instead of collecting users' private data to monitor, detect and stop unlawful and inappropriate conduct on its platform, as Yolo told their users they would do, Yolo was enriched by

49

their collection of minor users' private data and sold the data for advertisements and other profitable uses. The users of YOLO lost their privacy with no benefit in exchange, and they were exposed to harm as a result.

207.    Under these circumstances, it would be against equity and good conscience to permit Yolo to retain the ill-gotten benefits that it received from Plaintiffs and members of the National Class.

## <u>COUNT IV − OREGON Unlawful Trade Practices Act</u>
Plaintiff Estate of Carson Bride on behalf of the Oregon Subclass and Kristin Bride against Yolo and Gregoire Henrion

208.    The plaintiffs adopt and incorporate by reference all allegations contained in the foregoing paragraphs as though fully set forth herein.

209.    Plaintiff Estate of Carson Bride and Kristin Bride brings this claim under the Oregon Unlawful Trade Practices Act, Oregon Revised Statute § 646.605, on behalf of the Oregon Subclass against Yolo.

210.    The Oregon Unlawful Trade Practices Act (UTPA), ORS §646.605 *et seq*., protects persons who obtain real estate, goods or services primarily for personal, family or household purposes from fraudulent and unfair business practices.

211.    The UTPA generally prohibits the false representation or false advertising of goods and services, including false representations about the

50

characteristics, uses, benefits, and qualities of good or services. ORS § 646.608(1)(e).

212.  YOLO was marketed, provided, and sold to Yolo's customers primarily for personal, family or household purposes.

213.  As described above, the defendants made false and material statements to their users, including Carson Bride, and their users' parents, including Kristin Bride, about the specific steps they would take to improve the safety of their anonymous messaging apps, and they failed to inform their users and their users' parents about the inherent dangers, risks, and negative effects of using their anonymous messaging apps, and that their apps lacked adequate safeguards to prevent bullying and harassment from proliferating.

214.  Among those false statements, Yolo made the misrepresentations that it would reveal the identifies of users who engage in inappropriate and bullying conduct and ban them, and that it would respond to complaints or inquiries through its Contact Us form and "Law Enforcement" email.

215.  The unlawful trade practices alleged herein caused an ascertainable loss of injury to Plaintiffs and the subclass, including a loss of money and property. Because of the emotional distress and death that Carson Bride suffered as a result of the defendants' conduct, he has lost his earning capacity and income. And Carson Bride and his mother Kristin Bride also

51

incurred funeral expenses as a result of Carson's death that was caused by the defendants' conduct. Carson Bride and members of the Oregon Subclass also lost their personal property by providing Yolo their personal information and data due to the defendants' misrepresentations.

216.   Pursuant to ORS § 646.638(1), the plaintiffs and each Oregon subclass member is entitled to a $200 minimum statutory penalty due to the unlawful trade practices alleged herein.

217.   The plaintiffs and the Oregon subclass are entitled to their reasonable attorneys' fees and costs pursuant to ORS § 646.638(3).

218.   The plaintiffs and the Oregon subclass are entitled to injunctive and equitable relief, and any other relief that is appropriate under the UTPA.

## COUNT VII: COLORADO CONSUMER PROTECTION ACT
Plaintiff A.K. on behalf of the Colorado Subclass against Yolo and Gregoire Henrion

219.   The plaintiffs adopt and incorporate by reference all allegations contained in the foregoing paragraphs as though fully set forth herein.

*The Estate of Carson Bride, et al. v. Yolo Technologies Inc., et al.*
THIRD AMENDED COMPLAINT

220.   Plaintiff A.K. brings this claim under the Colorado Consumer Protection Act, Colorado Rev. Stat. § 6-1-10 *et seq.*, against Yolo and on behalf of the Colorado Subclass.

221.   The Colorado Consumer Protection Act makes it unlawful to engage in deceptive trade practices, which include using deceptive representations in connection with goods or services, knowingly making a false representation as to the characteristics, uses, or benefits of services, or representing that goods or services are of a particular style or model if they know or should know they are of another. *See* Colo. Rev. Stat. § 6-1-105.

222.   Yolo violated these prohibitions by knowingly making the false, misleading, and deceptive statements about their goods and services, as described above, to A.K. and other users and parents of users in Colorado, with an intent that they rely on those statements in deciding to sign up for, download, and use YOLO.   Upon information and belief, A.K. and other members of the Colorado Subclass did reasonably rely on Yolo's statements about its goods and services. Yolo's misrepresentations proximately caused harm to A.K. and the Colorado Subclass, including emotional harm and lost property, among other things.

*The Estate of Carson Bride, et al. v. Yolo Technologies Inc., et al.*
THIRD AMENDED COMPLAINT

223.  Yolo engaged in these deceptive trade practices in the course of their business in which they provided and sold goods and services to A.K. and other users in Colorado.

224.  Yolo's unlawful acts and practices complained of herein affect the public interest.

225.  A.K. and the Colorado Subclass are entitled to all forms of available legal or equitable relief, including their actual damages, civil penalties, restitution, punitive damages, declaratory relief, injunctive relief, and attorneys' fees and costs. *See* Colo. Rev. Stat. § 6-1-110, § 6-1-112, § 6-1-1-113.

## COUNT VIII: PENNSYLVANIA UNFAIR TRADE PRACTICES LAW
Plaintiff A.O. on behalf of the Pennsylvania Subclass against Yolo and Gregoire Henrion

226.  The plaintiffs adopt and incorporate by reference all allegations contained in the foregoing paragraphs as though fully set forth herein.

227.  'Plaintiff A.O. brings this claim under the Unfair Trade Practices and Consumer Protection Law, 73 Pa. Stat. Ann § 201-1 *et seq.*, on behalf of the Pennsylvania Subclass against Yolo.

228.  Pennsylvania law prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or

54

commerce," including making deceptive representations in connection with goods or services, representing that goods or services have characteristics, uses, benefits, or qualities that they do not have, and representing that goods or services are of a particular standard, quality or grade when they are of another. *See* 73 Pa. Stat. § 201-2, 201-3.

229.   Yolo violated these prohibitions by making the false, misleading, and deceptive statements about its goods and services, as described above, to A.O. and other users and parents of users in Pennsylvania, with an intent that they rely on those statements in deciding to sign up for, download, and use YOLO. A.O. and other members of the Pennsylvania Subclass did reasonably rely on Yolo's statements about its goods and services, and as a result were harmed, suffering emotional harm and losing property, among other things.

230.   Yolo engaged in trade and commerce within the meaning of 73 Pa. Stat. § 201-2(3), because it sold and distributed services and commodities to its users in Pennsylvania in exchange for user's time, attention, and personal data.

231.   A.C. and the Minnesota Subclass are entitled to all forms of available legal or equitable relief under Minnesota Stat. § 325F.69, including their actual damages, treble damages, civil penalties, restitution, declaratory relief,

55

injunctive relief, and attorneys' fees and costs. *See* 73 Pa. Stat. § 201-9.2; *id.* § 201-8; *id.* § 201-4; *id.* § 201-4.1.

### COUNT IX: MINN. FALSE STATEMENT IN ADVERTISING ACT
Plaintiff A.C. on behalf of the Minnesota Subclass against Yolo and Gregoire Henrion

232. The plaintiffs adopt and incorporate by reference all allegations contained in the foregoing paragraphs as though fully set forth herein.

233. Plaintiff A.C. brings this claim under the Minnesota False Statement in Advertising Act, Minn. Stat. § 325F.67 *et seq.*, on behalf of the Minnesota Subclass against Yolo.

234. Minnesota Stat. § 325F.69 provides that "The act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby, is enjoinable as provided in section 325F.70."

235. Yolo violated these prohibitions by making false and material statements about its goods and services, as described in detail above, to A.C. and other users and parents of users in Minnesota, with an intent that they rely on those statements in deciding to sign up for, download, and use YOLO. A.C. and other members of the Minnesota Subclass did rely on

56

Yolo's statements about its goods and services and as a result were harmed, including suffering emotional harm and losing property, among other things.

236.    Yolo sold merchandise to its users within the meaning of Minn. Stat. § 325F.68. By transferring the YOLO app to users and allowing them to communicate on YOLO in exchange for the time, attention, and personal data of its users, Yolo sold goods and services to its users within the meaning of Minn. Stat. § 325F.68.

237.    Yolo's unlawful acts and practices complained of herein affect the public interest.

238.    A.C. and the Minnesota Subclass are entitled to all forms of available legal or equitable relief under Minnesota Stat. § 325F.69, including their actual damages, civil penalties, restitution, declaratory relief, injunctive relief, and attorneys' fees and costs. *See* Minn. Stat. § 8.31(3); *id.* § 325F.70.

## **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiffs, on behalf of themselves and National Class and Subclasses, defined herein prays for judgment against the defendants as follows:

A.    For an order certifying this action and/or common issues raised herein as a class action under Rule 23(a) and (b)(3), or any other appropriate provisions of Rule 23; designating The Estate of Carson Bride, Kristin

57

Bride, A.K., A.C., A.O., and the Tyler Climenti Foundation as Class and Subclass Representatives; and appointing the undersigned to serve as class counsel.

B.    For notice of class certification and of any relief to be disseminated to all Class Members, and for such other further notices as this Court deems appropriate under Fed. R. Civ. P. 23(d)(2).

H.    For an award of compensatory damages in the amount exceeding $5,000,000, to be determined by proof of all injuries and damages described herein and to be proven at trial;

I.    For an award to the plaintiffs, the National Class members, and the Subclass members of appropriate relief, including actual and statutory damages;

J.    For an award to the plaintiffs, the National Class members, and the Subclass members of punitive damages to the extent allowable by law, in an amount to be proven at trial;

M.    For compensation to Plaintiff Estate of Carson Bride for the physical and emotional pain and distress which Plaintiff Carson Bride suffered during months preceding his death from the use of the defendants' apps, for his wrongful death, for the pecuniary loss and loss of society, companionship and services to the parents of Carson Bride, including punitive damages

58

against Yolo for the gross, continued, and callous misrepresentations and non-response of Yolo toward Kristin Bride and the Estate of Carson Bride, even after being notified of the Carson's death multiple times, and expenses incurred for services rendered to Carson Bride, decedent, including charges for burial and memorial services. For similar categories of compensation appropriate for all other plaintiffs.

N.    For an award of reasonable attorney's fees and costs, including expert witness fees;

O.    For an award of pre-judgment and post-judgment interest; and

P.    Any other relief as may be just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

The plaintiffs hereby demand a trial by jury for all issues a jury may properly decide and for all of the requested relief that a jury may award.

October 24, 2024

Respectfully submitted,

*/ s / Juyoun Han*
Juyoun Han (*pro hac vice*)
Eric Baum (*pro hac vice*)
**EISENBERG & BAUM, LLP**
24 Union Square East, PH
New York, NY 10003
Tel: (212) 353-8700
Fax: (212) 353-1708

59

jhan@eandblaw.com
ebaum@eandblaw.com

John K. Buche (CA Bar No. 239477)
**BUCHE & ASSOCIATES, P.C.**
2029 Century Park E., Suite 400N
Los Angeles, CA 90067
Tel: (310) 593-4193
Fax: (858) 430-2426
jbuche@buchelaw.com

*Attorneys for Plaintiffs*

*The Estate of Carson Bride, et al. v. Yolo Technologies Inc., et al.*
THIRD AMENDED COMPLAINT